L. T. Russell v. Commissioner.
Russell v. Commissioner
Docket No. 112000.
United States Tax Court
1943 Tax Ct. Memo LEXIS 67; 2 T.C.M. (CCH) 959; T.C.M. (RIA) 43470; October 27, 1943
*67 L. T. Russell, pro se. John M. Edwards, Esq., for the respondent. SMITH Memorandum Findings of Fact and Opinion SMITH, Judge: This proceeding is for the redetermination of a deficiency in income tax for the calendar year 1935 in the amount of $64,971.34 plus a five percent negligence penalty of $3,248.57. The petition alleges that the respondent erred in his determination that the petitioner realized a capital gain from the transfer in 1935 of shares of common and preferred stock of the Newark Morning Ledger Co. in settlement of his indebtedness to that company, instead of a claimed loss of $2,000. Findings of Fact 1. The petitioner is a resident of Orange, N. J. He filed a joint income tax return for himself and wife, Marion G. Russell, for the calendar year 1935 with the collector or internal revenue for the fifth district of New Jersey. 2. Such return showed a gross income of $20,837.15 (consisting of salary $22,837.15, less a capital net loss of $2,000), and deductions from gross income of $5,406.07, leaving a net taxable income of $15,431.08. L. T. Russell will hereinafter be referred to as the petitioner. 3. Upon audit of the return the respondent determined that the correct *68 net income was in the amount of $163,906.60; that there was a deficiency in income tax of $64,971.34 and a five percent negligence penalty due in the amount of $3,248.57. In such determination the respondent held that the petitioner was not entitled to the deduction of $970 "transfer tax" and that he had not sustained a capital loss of $2,000 as claimed but had a net capital gain for the year in the amount of $145,505.52. He explains the computation of the net capital gain as follows: It is held that a taxable capital gain of $70,666.67 was realized during the taxable year 1935 on the transfer during that year of 25,500 shares of the common capital stock of the Newark Morning Ledger Co. and a gain of $74,838.85 on the disposition of preferred and common stock of that company in settlement of your indebtedness to that company or a total of $145,505.52 instead of a capital loss of $2,000 as shown on your return. 4. In 1915 the petitioner published a morning paper at Elizabeth, N. J. At the same time he was a member of the New Jersey Board of Assessments and Taxes. In 1916 a morning newspaper published in Newark ceased publication. The petitioner during that year sold his newspaper *69 in Elizabeth at a price of approximately $37,500 and put that money and about $16,000 obtained from the sale of real estate into the publication of a newspaper in Newark called Newark Morning Ledger. His wife, who had an independent income, also invested some money in the enterprise. In 1917 or 1918 this business was incorporated under the name of Newark Morning Ledger Co. The petitioner and his wife had about $100,000 invested in the business and the company was incorporated with a capital stock of $100,000. No certificates for shares were issued until many years later. 5. In 1918 one C. W. Feigenspan, president of the Federal Trust Co. and of the Feigenspan Brewery, advanced $220,000 to the Ledger Co. to enable it to continue publication. Feigenspan desired to withdraw his money and accepted $100,000 in settlement therefor. This $100,000 was charged to the personal account of the petitioner on the company's books of account. 6. In 1914 the petitioner took out two policies of insurance upon his life for the benefit of his wife and family in the face amount of $20,000. During the years 1921 and 1922 he took out additional insurance policies on his life in the face amount of $125,000. *70 During the years 1925 and 1926 the petitioner took out additional policies in the face amount of $125,000. A part, if not all, of the premiums paid on these policies from 1917 on were paid by the Ledger Co. and charged to the personal account of the petitioner. 7. In 1927 the Ledger Co. by amendment of its charter was authorized to issue 20,500 shares of no par value preferred stock entitled to cumulative dividends at the rate of $3.50 per share per annum and also 25,000 no par value preferred shares entitled to cumulative preferred dividends of 80 cents per annum per share. The preferred stockholders were entitled to receive upon the dissolution of the company $50 per share and $10 per share, respectively. In all 6,358 shares of the $3.50 preferred stock and 12,489 shares of the 80 cents preferred stock were sold. Dividends on the preferred shares were passed in 1932 and none have been paid thereon since 1932. 8. By reason of strikes the Ledger Co. sustained losses from operation during some of the years from 1932 to 1934, inclusive. 9. The Ledger Company's balance sheet as at January 23, 1935, showed as follows: ASSETS
Current Assets (including
$128,882.57 cash)
$ 213,547.42
Due from officers: L. T. Russell, Sr.
secured by assign-
ment of life insur-
ance policies to
an aggregate face
value of $270,000
and a present net
cash surrender
value of $46,138.12) $281,370.20
Marion G. Russell 13,277.55
L. T. Russell, Jr. 1,808.87
Total due from officers
296,456.62
Total other assets
4,961.96
Fixed assets
331,659.09
Deferred assets
25,753.78
Intangible assets: Goodwill
1,000,000.00
Total
$1,872,378.87
LIABILITIES AND CAPITAL
Total current liabilities
$ 148,917.30
Fixed liabilities: Mortgages payable and notes pay-
able
43,734.00
Deferred income
1,000.00
Capital stock: Common stock $596,000.16
Preferred stock 442,790.00
Capital stock paid for
but not issued 3,165.46
Total capital stock
1,041,955.62
Capital surplus
610,143.73
Earned surplus
26,628.22
Total liabilities and capital
$1,872,378.87
*71 10. By virtue of an order dated February 5, 1935, the Court of Chancery of New Jersey, upon a complaint of William I. Coats that the petitioner was indebted to the Ledger and that the Ledger was being mismanaged by the petitioner, trustees were appointed to operate and manage the Ledger. 11. On April 24, 1935, the petitioner and Samuel I. Newhouse entered into an agreement, the purpose and intent of which was to obtain the discharge of the trustees. By this agreement the petitioner agreed to relinquish the control of the Ledger upon the terms and provisions therein stated. It was provided, first, that Newhouse should deposit $110,000 with two individuals which was to be used in paying to the Ledger Co. the indebtedness of the petitioner to that company in case the amount should not be found to be in excess of $100,000, with the further provision that if the deposit was in excess of the determined liability the excess would be refunded to Newhouse and if the correct amount of the indebtedness was in excess of $110,000 the petitioner should not be relieved from such excess. The petitioner on his part agreed to deposit in escrow with the same two individuals full title to 49,765 share *72 of the 50,000 shares of common stock of the Ledger Co. outstanding, of which amount on the closing of the agreement 25,500 shares should be issued to Newhouse or his designee, and the balance to the petitioner or his designee. It was further provided that the Ledger Co. should enter into an employment contract with the petitioner by which he would be paid during life a salary of $400 per week for such services as he might be called upon to render. This was upon condition that Russell should not publish any paper in Passaic or surrounding counties for a period of ten years. Newhouse was also to be employed by the Ledger Co. at a like salary and the petitioner's son, Edwin F. Russell, was to be employed for a period of five years at a salary of $150 per week for the first year, $175 per week for the second year, and $200 per week for the third, fourth and fifth years. It was further provided that the petitioner should have the privilege of occupying a penthouse apartment on the top floor of the building in which was housed the business of the Newark Morning Ledger. The contract further provided that the 1,535 shares of seven percent preferred stock and 2,941 shares of eight percent *73 preferred stock, together with 32 shares of common stock, the purchase price of which had been charged to the personal account of the petitioner, should become assets of the Ledger Co. Also, that the insurance policies on the life of the petitioner should be deemed to be assets of the Ledger Co. 12. By a contemporaneous agreement entered into between the same parties on the same day, April 24, 1935, and made a part of the above-named agreement, it was provided that Newhouse should organize a corporation by the name of Cortland Co., which was to have a capital stock consisting of 200 common shares, 100 to be designated as "A" common stock with voting privileges and to be issued to Newhouse, and 100 shares class "B" nonvoting common stock, which were to be issued to Russell or his designee. Newhouse agreed to pay into the corporation $200,000 cash, which was to be used in acquiring the outstanding preferred common shares of the Newark Morning Ledger Co., the preferred shares to be turned into the Ledger Co. for cancellation and the 203 common shares if, as, and when acquired, to be reissued to the petitioner or his designee. After the above referred to contracts were executed a reference *74 master endeavored to ascertain the true indebtedness of the petitioner to the Ledger Co. Before there had been any adjudication of the indebtedness there was an agreement between the petitioner and Newhouse that the petitioner's and his wife's indebtedness to the Newark Morning Ledger Co. should be cancelled in consideration of the $110,000 which had been furnished to the above-named escrow agents by Newhouse. 13. On April 24, 1935, the petitioner owned no real estate, no stock or bonds, aside from the shares of stock of the Newark Morning Ledger Co. standing in his name, or any other assets of value. He was dependent entirely upon his salary for a living. 14. The petitioner continued to receive his salary of $400 per week from the Ledger Co. until some time in 1937, when it was forfeited by reason of a violation of the condition upon which it was being paid, namely, his attempting to publish another newspaper in competition with the Newark Morning Ledger. 15. Aside from the salary contract the petitioner received nothing of appreciable value from the two agreements with Newhouse on April 24, 1935, and the settlements made thereunder. Opinion The questions presented by this proceeding *75 are (1) whether the petitioner sustained a capital loss of $2,000 during the calendar year 1935 which is deductible from gross income; (2) whether he is entitled to the deduction of transfer taxes in the amount of $970; and (3) whether he had a net capital gain of $145,505.52 from the sale of shares of common capital stock and preferred capital stock of the Newark Morning Ledger Co. during the calendar year. At the hearing of this proceeding the petitioner waived his claim to the deduction of a net capital loss of $2,000; he offered no proof that he paid $970 transfer tax. Accordingly, those issues are determined against the petitioner. The principal question in issue is whether the petitioner had a capital gain from the sale of 25,000 shares of common capital stock of the Newark Morning Ledger Co. and a net capital gain from the disposition of preferred and common stock, as shown by our findings. The petitioner asserts that he received nothing of value from the transaction which took place in 1935 resulting in his relinquishment of all of his interest in the Newark Morning Ledger Co., aside from a contract under which he was to be paid for such services as he might be called upon *76 to render a salary of $400 per week for life. The receipt of this contract for the performance of services does not enter into the computation of the net capital gain which the respondent has determined was realized by the petitioner from the transfer of all his shares of stock in the Newark Morning Ledger Co. The respondent's agent had much difficulty in ascertaining the facts in this case. During a part of 1935 the petitioner was ill, both physically and mentally. For a part of the time he was in a sanitarium at Battle Creek, Mich. The revenue agent found that upon the books of account of the Ledger Co. at April 30, 1935, the close of the company's fiscal year, the petitioner was charged with an indebtedness to the corporation of $278,512.23. He found an entry upon the company's journal for 1927 of the issuance of $500,000 common capital stock to the petitioner and a charge to good will of a like amount. He therefore assumed that the common capital stock of the Ledger Co. owned by the petitioner was acquired at a cost of zero. He further ascertained that there had been charged against the petitioner on the company's books of account an amount of $31,521.15, which represented the *77 amount at which 2,856 shares of eight percent preferred stock, 1,519 shares of seven percent preferred stock, and 37 shares of common stock had been purchased from the public and charged to the petitioner's account upon the books of the company. In the settlement between the petitioner and Newhouse these shares of stock were deemed to be the assets of the Ledger Co. Likewise in the settlement the petitioner was given a credit against his indebtedness to the company of $106,360 in respect of those shares. The revenue agent assumed that this was the selling price of such shares and he determined that the difference between such amount and $31,521.15, or $74,838.85, represented a capital gain realized by the petitioner in 1935 from the transaction. Since he could not determine that the petitioner had owned these shares for more than a short period he held that the $74,838.85 constituted taxable capital net gain in its entirety. The revenue agent also determined that the selling price of the 25,500 shares of common stock was $110,000 cash put up by Newhouse to pay petitioner's indebtedness to the Ledger Co. plus $66,666.67, which he determined was the fair value of the petitioner's interest *78 in the class B nonvoting stock of the Cortland Co. which was to be issued to the petitioner or his designee. He thus held that the total capital gain realized on the transfer of the 25,500 shares of common stock was $176,666.67; but since the petitioner had held the shares over a period of years he determined that he was taxable upon only 40 percent of the gain or $70,666.67. This amount, plus the computed gain of $74,838.85 on the transfer of the preferred and common shares referred to above, makes up the $145,505.52 which the respondent has determined was the taxable capital gain realized upon the transaction. The revenue agent's computations were accepted by the respondent as his determination of the deficiency. We think it plain that the revenue agent erred in two particulars in the determination of the capital gain. He first assumed that the petitioner acquired his shares of stock in the Ledger Co. at a cost of zero for the common stock and of only $31,521.15 for the preferred stock. We are persuaded that this is not correct. The evidence shows that the petitioner had a large investment in the stock of the Ledger Co. He invested between $60,000 and $70,000 cash in the founding *79 of the Ledger in 1916. Marion G. Russell, who had an independent income, also advanced considerable amounts of money for the promotion of the paper. The total investment of the petitioner and his wife in the paper in 1917 was approximately $100,000. The evidence also shows that petitioner, during the year 1914 and the early twenties, insured his life in the amount of $270,000. These policies were all in force in 1935. The total premiums that had been paid on the policies were in excess of $188,000. Under the agreements between the petitioner and Newhouse all of these policies became assets of the Ledger Co., except such policies as had been assigned to the International Paper Co. in settlement of that company's claims against the Ledger Co. From the foregoing it seems plain that the actual investment of the petitioner in the Newark Morning Ledger Co. stock was at least equal to the $278,512.23 indebtedness of the petitioner to the company at April 30, 1935. We are also of the opinion that the respondent erred in his determination that the petitioner received the cash equivalent of $176,666.67 from the transfer of 25,500 shares of common stock of the Newark Morning Ledger Co. in *80 1935 and of $106,360 from the sale of preferred stock plus a few shares of common stock in that year. It is very apparent from a careful reading of the two contracts entered into between the petitioner and Newhouse on April 24, 1935, that nothing of appreciable value was given to the petitioner for his investment in the Ledger Co. It is inconceivable that they would have been executed by a man who was not mentally confused or who could properly understand the contracts. By one of them the petitioner or his designee was to receive the class B nonvoting common stock of the Cortland Co. This company was under the complete domination of Newhouse. He was to furnish the capital of the company, which was to acquire shares of the preferred stock of the Ledger Co. and turn them into that company for cancellation. The class B common shares never had any value. By the other contract executed by the petitioner on the same date he relinquished his entire control of the Ledger Co. The conditions of the contract were such that the petitioner's consideration received, aside from the cancellation of his alleged indebtedness to the Morning Ledger Co., had no value. It does not appear that Newhouse *81 was ever required to pay to the Ledger Co. any of the alleged indebtedness of the petitioner to that company. He did put up a certified check for $110,000. But the provisions of the contract were that any part thereof which was not needed to pay the indebtedness to the Ledger Co. was to be returned to Newhouse. The petitioner got none of it. It is true that the indebtedness of the petitioner and his wife, Marion G. Russell, to the Ledger Co. was cancelled. The indebtedness of Marion G. Russell was only in a small amount. The indebtedness due from the petitioner was uncollectible; for he had no property whatever besides his ownership of shares of stock of the Ledger Co. The book indebtedness of the petitioner to the Ledger Co. was largely on account of premiums on life insurance policies on the life of the petitioner which had been paid by the Ledger Co. Under the agreements the petitioner lost all of his interest in the insurance policies. In this situation we can not see how the cancellation of the petitioner's indebtedness to the Ledger Co. was of any material benefit to him. The entire picture presented by this proceeding is that the petitioner in the early part of 1935 owned *82 a valuable interest in the Newark Morning Ledger Co. This was the only property that he owned. By the two agreements entered into on April 24, 1935, and the settlements made thereunder he gave up everything he had. He was to receive a minority interest in the common stock of the company. But we are persuaded that this minority interest had no appreciable value - at least equalling the petitioner's investment in those shares above the petitioner's alleged indebtedness to the Ledger Co. Upon the closing of the agreements Newhouse was in complete control of the Ledger Co. and the petitioner's interest therein was practically worthless. The determination of the respondent that the petitioner realized a capital gain from the transfer of shares of stock of the Newark Morning Ledger Co. in 1935 is reversed. 13. The respondent's determination of the five percent negligence penalty is based upon the assumption that the petitioner had erroneously failed to report a capital gain from the sale of his interest in the Ledger Co. Since we have concluded that the petitioner had no capital gain during the year the petitioner is not liable to a five percent negligence penalty on the small deficiency *83 in tax which will be found to be due. Decision will be entered under Rule 50.